UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

M.T., on behalf of N.M.,

                    Plaintiff,

        - against -

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                    Defendant.
────────────────────────────────

13 Cv. 4363 (JGK)

OPINION AND ORDER

JOHN G. KOELTL, District Judge:

    The plaintiff, M.T., brings this action on behalf of her
son, N.M., pursuant to the Individuals with Disabilities
Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., against the
New York City Department of Education (the "DOE").  The
plaintiff challenges the decision of the State Review Officer
("SRO"), denying her claim for payment of N.M.'s tuition for the
Rebecca School, a private school for children with
neurodevelopmental delays, at which N.M. was unilaterally placed
for the 2010-2011 school year.  The SRO's decision reversed the
decision of an Impartial Hearing Officer ("IHO").  The parties
have cross-moved for summary judgment on the plaintiff's IDEA
claim.  The Court has subject matter jurisdiction pursuant to 28
U.S.C. § 1331 and 20 U.S.C. §§ 1415(i)(2)(A) and (3)(A).

    For the reasons explained below, the plaintiff's and
defendant's motions for summary judgment on the IDEA claim are

1

both **denied**, and the case is **remanded** to the state administrative officers for further proceedings.

## I.

"Under the IDEA, states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education.'" Gagliardo v. Arlington Cent. Sch. Dist. ("Gagliardo II"), 489 F.3d 105, 107 (2d Cir. 2007) (quoting 20 U.S.C. § 1412(a)(1)(A)); see also Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998). A free appropriate public education ("FAPE") must provide "special education and related services tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.'" Walczak, 142 F.3d at 122 (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982) (internal quotation marks and citation omitted)). Because the IDEA expresses a "strong preference for children with disabilities to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers, special education and related services must be provided in the least restrictive setting consistent with a child's needs." Id. (internal citation omitted); see also R.S. ex rel. A.S. v. Lakeland Cent. School Dist., No. 09 Cv. 9874, 2011 WL 1198458, at *1 (S.D.N.Y. March 30, 2011).

"To ensure that qualifying children receive a FAPE, a
school district must create an individualized education program
('IEP') for each such child."  R.E. v. N.Y.C. Dept. of Educ.,
694 F.3d 167, 175 (2d Cir. 2012) (citing 20 U.S.C. § 1414(d);
Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195,
197 (2d Cir. 2002) (describing the IEP as the "centerpiece" of
the IDEA system)).  The IDEA requires that an IEP be "reasonably
calculated to enable the child to receive educational benefits."
Rowley, 458 U.S. at 207.  In New York, the responsibility for
developing an appropriate IEP for a child is assigned to a local
Committee on Special Education ("CSE").  Walczak, 142 F.3d at
123.  "CSEs are comprised of members appointed by the local
school district's board of education, and must include the
student's parent(s), a regular or special education teacher, a
school board representative, a parent representative, and
others."  R.E., 694 F.3d at 175 (citing N.Y. Educ. Law §
4402(1)(b)(1)(a)).  "The CSE must examine the student's level of
achievement and specific needs and determine an appropriate
educational program."  Id. (citing Gagliardo II, 489 F.3d at
107–08).

Parents in New York who wish to challenge their child's IEP
as insufficient under the IDEA may request an impartial due
process hearing before an IHO appointed by the local board of
education.  Walczak, 142 F.3d at 123 (citing 20 U.S.C. §

1415(f); N.Y. Educ. Law § 4404(1)).  A party may appeal the decision of the IHO to an SRO, and the SRO's decision may be challenged in either state or federal court.  Id. (citing 20 U.S.C. § 1415(g), 1415(i)(2)(A) and N.Y. Educ. Law § 4404(2)); see also R.S., 2011 WL 1198458, at *1.  In addition, if a school district fails to provide a FAPE to a child with disabilities, the child's parents may, at their own financial risk, remove the child from the improper placement, enroll the child in an appropriate private school, and retroactively seek reimbursement for the cost of private school from the state.  See Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 370 (1985).

Under the IDEA, a district court must conduct an independent review of the administrative record, along with any additional evidence presented by the parties, and must determine by a preponderance of the evidence whether the IDEA's provisions have been met.[1]  Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 380-81 (2d Cir. 2003); see also Gagliardo II, 489 F.3d at 112.  This independent review, however, is "by no means an

---

[1] The Second Circuit Court of Appeals has noted that, "[s]ummary judgment in the IDEA context ... is only a pragmatic procedural mechanism for reviewing administrative decisions." M.W. ex rel. S.W. v. New York City Dep't of Educ., 725 F.3d 131, 138 (2d Cir. 2013) (internal citation and quotation marks omitted).  However, "[t]he inquiry ... is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." Wall v. Mattituck-Cutchogue Sch. Dist., 945 F.Supp. 501, 508 (E.D.N.Y.1996);see also T.G. ex rel. R.P. v. New York City Dep't of Educ., 973 F. Supp. 2d 320, 323 (S.D.N.Y. 2013).

invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206.

The Second Circuit Court of Appeals has explained that "the standard for reviewing administrative determinations 'requires a more critical appraisal of the agency determination than clear-error review ... but ... nevertheless[ ] falls well short of complete de novo review .... [I]n the course of th[is] oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale.'" M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012) (quoting Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086–87 (1st Cir. 1993)). "[T]he district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court. But the district court's determination of the persuasiveness of an administrative finding must also be colored by an [acute] awareness of institutional competence and role." Id.

The Court of Appeals has also explained that "federal courts reviewing administrative decisions must give 'due weight' to these proceedings, mindful that the judiciary generally

'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Gagliardo II, 489 F.3d at 113 (quoting Rowley, 458 U.S. at 206, 208); see also Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005). Deference to the decision in the administrative record is particularly appropriate when the administrative officers' review has been thorough and careful, and when the court's decision is based solely on the administrative record. See Walczak, 142 F.3d at 129; Frank G. v. Bd. of Educ., 459 F.3d 356, 367 (2d Cir. 2006); see also D.C. ex rel. E.B. v. New York City Dep't of Educ., 950 F. Supp. 2d 494, 497-98 (S.D.N.Y. 2013). When, as in this case, "an IHO and SRO reach conflicting conclusions, we defer to the final decision of the state authorities, that is, the SRO's decision." M.W., 725 F.3d at 139 (internal citation and quotation marks omitted). However, the amount of deference to an SRO's determination "depends on the quality of that opinion." Id. (internal citation and quotation marks omitted). See also D.A.B. v. New York City Dep't of Educ., 973 F. Supp. 2d 344, 350 (S.D.N.Y. 2013).

## II.

The following facts and procedural background are taken from the administrative record and the submissions of the parties. The facts are undisputed unless otherwise noted.

6

### A. IEP AND PLACEMENT

M.T. is the mother of N.M., a child classified with autism, specifically Asperger's Syndrome, and also diagnosed with Attention Deficit Hyperactivity Disorder.  (Ex. 4 ("IEP") at 1, 5.)[2]  N.M. was born in May 2000, and was approximately ten years old at the time of the 2010-11 school year at issue in this case.  (IEP at 1.)

At age three, N.M. was evaluated by the Committee on Preschool Special Education and began to receive special education services.  (IHO Op. at 10.)  N.M. remained in a program from pre-K to kindergarten.  (IHO Op. at 10.)  During this program, he was not able to make friends and struggled to remain in the classroom.  (IHO Op. at 10.)  M.T. removed him from the program and placed him in parochial school, where he repeated kindergarten during the 2006-07 school year.  (IHO Op. at 10.)  After N.M. was diagnosed with autism, M.T. placed him in a general education class with Special Education Teacher Support Services (SETSS) at P.S. 20.  (IHO Op. at 10.)  In October 2008, M.T. removed N.M. from P.S. 20 and enrolled him in the Rebecca School for the remainder of the 2008-09 school year. (IHO Transcript ("Tr.") 61.)  He remained there for the 2009-10

---

[2] Exhibits with numbers refer to the defendant's exhibit appendix. Exhibits with letters refer to the plaintiff's exhibit appendix. Both appendices were submitted to the SRO. Neither party challenges the authenticity of the exhibits.

school year and the school district paid the tuition for both years.  (IHO Op. at 10-11.)  At the Rebecca School, N.M was placed in an 8:1:3 class, where he received occupational therapy, adaptive physical education, speech therapy, art therapy, and counseling.  (Tr. 614; Ex. B.)

On May 27, 2010, the CSE met in order to prepare a 2010-11 IEP for N.M. (SRO Op. at 3.)  Present at the meeting were N.M.'s mother, M.T.; Feng Ye, a district representative and special education teacher; Rose Fochetta, a district school psychologist; Gwen Levine, a Rebecca School social worker; Spencer Leeds, N.M.'s Rebecca School teacher; and a parent representative.  (IEP at 2.)  The CSE considered a number of documents at the meeting including a psycho-educational evaluation of N.M. (the "Evaluation") conducted by the Rebecca School in 2010 (Ex. 5; Tr. 45), a 2009 classroom observation of N.M. by Ms. Fochetta (Ex. 8), and N.M.'s Interdisciplinary Progress Report ("Progress Report") written by the Rebecca School in 2010.  (Ex. 9; Tr. 55.)

The Evaluation, conducted by Dr. Lynn Seskin, showed that N.M. had a "Full Scale IQ" of 95, in the 37th percentile, indicating that his overall cognitive abilities are in the average range.  (Ex. 5 at 14.)  However, he scored in the "very low" range in total academic achievement and individual areas of spelling and writing fluency.  (Ex. 5 at 15.)  He scored in the

low range in numerous areas including reading fluency and math fluency. (Ex. 5 at 15.) Based on M.T.'s observations of N.M.'s functioning, the Evaluation concluded that N.M. demonstrated an "adequate" level of adaptive functioning, showing adequate and improving communication, social skills, behavior, and motor skills. (Ex. 5 at 7-8, 11.) Finally, it indicated that N.M. was "exhibiting internalizing and externalizing behaviors at levels high enough to warrant continued monitoring or intervention." (Ex. 5 at 9.)

Accordingly, the Evaluation recommended that N.M. be placed in a "developmentally focused and academically enriched program with a low student-teacher ratio that will support his language, motor, and cognitive development and improve his socialization and coping skills." (Ex. 5 at 12.) Dr. Seskin explained that N.M. "would benefit from a highly structured special education classroom environment with a strong language-based curriculum" and that he "requires a highly individualized program that can adequately support his need for additional time on academic activities." (Ex. 5 at 12.) The Evaluation further recommended counseling services and speech and language therapy. (Ex. 5 at 12.)

The report submitted by Ms. Fochetta, the school psychologist, consisted of her observation of N.M. receiving

one-on-one math instruction for approximately thirty minutes.
(Ex. 8.)  The report made no recommendation.

The 2010 Progress Report was submitted to the CSE by the
Rebecca School.  (Ex. 9.)  It described a number of goals for
N.M. to meet in areas such as education, occupational therapy,
speech-language therapy, receptive language, and expressive
language.  (Ex. 9 at 1.)  N.M. met goals in a number of areas,
including expressing his emotions, expanding his ability to use
novel play ideas, and increasing his frustration tolerance.
(Ex. 9 at 4, 9.)  The Report stated that "over the past few
months we have seen a change in [N.M.'s] regulation" including
fewer moments of emotional dysregulation and an increased
ability to "calm himself down faster with minimal adult
support."  (Ex. 9 at 1.)  More time was still needed in areas
such as literacy, math, understanding sensory information, and
improving visual-spatial skills.  (Ex. 9 at 5-6, 8-9.)  Overall,
however, the report showed N.M. had made progress.

The resulting IEP classified N.M. as autistic and
recommended a ten-month school year.  (Ex. 4.)  It concluded
that he should be placed in a specialized class in a community
school with a student/teacher/paraprofessional ratio of 12:1:1,
and related services.  (IEP at 1.)  The IEP additionally
recommended a four-month 1:1 transitional paraprofessional for
N.M.  (IEP at 2.)  The CSE considered and rejected programs with

ratios of 12:1 and 12:1:1 without the transitional
paraprofessional because they were insufficiently supportive.
(IEP at 15.)  The IEP noted that N.M. "will need individual
support in order to make the transition from a private to a
public school." (IEP at 15.)

Regarding N.M.'s academic performance, the IEP noted that
N.M.'s cognitive functioning was in the average range, but that
he "still presents with anxiety and tends to give up quickly
although he has showed improvement." (IEP at 3.)  It stated he
benefits from "one-to-one support," responds well to praise, and
needs encouragement. (IEP at 3.)  In the "Social/Emotional
Performance" category, the IEP stated that the school report
showed areas of improvement, such as "utilizing pretend play" to
express his emotions and "remaining engaged in peer
interactions." (IEP at 4.)  It also noted the psychological
evaluation's description of N.M. as "highly empathetic and
attuned to the needs of others." (IEP at 4.)  It described
N.M.'s greatest challenge as "assert[ing] his own ideas and
needs during peer interactions." (IEP at 4.)  The IEP concluded
that N.M.'s behavior "does not seriously interfere with
instruction" and that it can be addressed by a special education
teacher, speech and language therapy, and occupational therapy.
(IEP at 4.)

The IEP also contained numerous annual goals and short-term objectives for N.M. in various academic and non-academic areas. (SRO Op. at 12-13.)  Finally, the IEP recommended several related services for additional support.  It recommended 1:1 counseling once a week for thirty minutes and 2:1 counseling once a week for thirty minutes in order to help address N.M.'s social and emotional management needs.  (IEP at 4, 16.)  It provided for 1:1 occupational therapy twice a week for thirty minutes to address N.M.'s health and physical management needs. (IEP at 5, 16.)  The IEP also recommended that N.M. receive 1:1 speech therapy twice per week for thirty minutes, and 3:1 speech therapy once a week for thirty minutes.  (IEP at 16.)

On June 23, 2010, the DOE mailed M.T. a Final Notice of Recommendation ("FNR") offering placement at P.S. 20 in a special class in a community school that purported to offer the services listed in the IEP.  (Ex. 3.)  M.T. did not subsequently visit P.S. 20 because the classroom was closed for the summer. (Ex. A.)  However, she later stated at the due process hearing that she had previously visited the school multiple times in different contexts.  (Tr. 611, 616-17.)  In a letter from M.T.'s attorney dated August 25, 2010, M.T. rejected the IEP and stated her intention unilaterally to enroll N.M. in the Rebecca School

for the 2010-11 school year.  (Ex. D.)[3]  M.T. signed an

enrollment contract for the Rebecca School on July 28, 2010.

(Ex. E.)

On July 26, 2011, M.T. filed a due process complaint notice

requesting an impartial hearing and seeking payment of N.M.'s

tuition at the Rebecca School for the 2010-11 school year.  (Ex.

A.)

The due process complaint focused primarily on the Rebecca

School's services and environment, and the appropriateness of

this setting for N.M. given his social and emotional deficits.

(Ex. A at 2.)  The complaint alleged that the proposed 12:1:1

ratio would not provide N.M. with sufficient individualized

support, and that a 10-month program would result in regression

in his academic, social, and emotional improvement.  (Ex. A at

2.)  On July 29, 2011, the DOE responded to the due process

complaint.  (Ex. 2.)

### B. Due Process Hearings

An impartial due process hearing was held over seven days

between September 26, 2011 and April 5, 2012. At the hearing,

there was testimony with respect to, among other things, the CSE

---

[3] The letter focused on the faculty ratios at the Rebecca School and N.M.'s
resultant "significant social, emotional and academic growth."  (Ex. D)  It
stated that the increase in students "not only threatens to stall [N.M.'s]
further development, but also raises the probability of significant
regression."  (Ex. D.)

meeting, the 12:1:1 ratio, and the four-month transitional paraprofessional.

Some of the witnesses testifying at the hearing had also been present at the CSE meeting, including Ms. Fochetta, Ms. Ye, and M.T.  Ms. Fochetta, the DOE psychologist, testified that the recommendation to place N.M. in 12:1:1 community school was appropriate because N.M. had an average cognitive functioning level and needed to be exposed to typically-developing peers. (Tr. 678.)  Ms. Fochetta explained that the CSE addressed N.M.'s apparent areas of weakness, such as math and written language, in the annual goals and short-term objectives in IEP. (Tr. 674-675.)  She testified that the CSE recognized N.M.'s social and emotional difficulties, and that the proposed placement provided a "supportive classroom environment."  (Tr. 679.)

Ms. Ye, the district representative and special education teacher, testified that N.M.'s cognitive functioning level indicated he would benefit from a less restrictive 10-month program.  (Tr. 99-100.)  Ms. Ye testified that the CSE team believed that the Rebecca School was too restrictive and not sufficiently academically oriented, and that for this reason, N.M. had not succeeded academically there.  (Tr. 103-104.)  Ms. Ye further explained that the CSE recommended a transitional paraprofessional because, based on the available reports, it was clear that N.M. benefited from one-on-one interactions and the

14

CSE wanted to "make the transition [to public school] more smooth for him." (Tr. 42.)  Ms. Ye also stated that after the four months had elapsed, the "school will decide whether there is a need to continue [the paraprofessional] or not." (Tr. 42.)

Finally, M.T. testified that she did not believe a 12:1:1 setting was appropriate for N.M. due to his social and emotional difficulties.  (Tr. 615.)  She stated that because he was currently in an 8:3:1 class, "it would be a difficult transition for him to be in a 12:1:1 and a 10-month school particularly was inappropriate." (Tr. 627.)

In addition to the witnesses that had been present at the CSE, there were several witnesses who testified before the IHO but did not participate in the CSE.  Jennifer Chase, the assistant principal at P.S. 20, described the class into which N.M. would have been placed under the IEP, as well as his proposed teacher and some of her methodologies.  (Tr. 142-48.) She explained the goals and methods of assessment in the IEP, but could not conclude whether N.M. would have achieved these goals because she did not know him.  (Tr. 152-197, 219.)

Sara Rivera, the guidance counselor at P.S. 20, testified that she would have provided N.M. with the counseling recommended in the IEP.  (Tr. 271.)  She stated that she had worked with N.M. when he attended the school in 2008, but had not told M.T. that the school was inappropriate for him, as M.T.

alleged.  (Tr. 299-300.)  Allison Veklotz, a school psychologist
at P.S. 20, described her role in working with teachers and
parents, but was not familiar with N.M.  (Tr. 325-28.)

Dr. Asma Sadiq, N.M.'s behavioral pediatrician for several
years, testified that social engagement is one of the biggest
challenges for N.M., and she did not believe the 12:1:1 setting
was appropriate for him.  (Tr. 563, 589-90.)  She stated that
she was pleased with N.M.'s progress at the Rebecca School
during the 2010-2011 school year.  (Tr. 587-88.)  Tina McCourt,
the program director at the Rebecca School, explained the
services N.M. was receiving at the Rebecca School, noted his
improvement, and testified that she did not believe he would
have enough adult support in a 12:1:1 setting.  (Tr. 360-68.)
Similarly, Dr. Eileen Feliciano, a Rebecca School psychologist,
testified that a 12:1:1 setting would not provide N.M. with
adequate monitoring and support due to a need for "specialized
instruction."  (Tr. 442.)  Finally, Carter Swope, N.M.'s Rebecca
School teacher for the 2010-2011 school year, also testified
that N.M. needed more adult support than was available in a
12:1:1 setting.  (Tr. 518.)  However, she noted that N.M. is an
"incredibly verbal" and "high functioning student," with "strong
academic skills."  (Tr. 502.)

On April 24, 2012, the IHO issued her Findings of Fact and Decision.  The IHO held that the DOE failed to establish that it offered N.M. a FAPE for the 2010-2011 school year.

The IHO found that the only members of the CSE team that agreed with the proposed placement were those who had never worked with N.M., as opposed to the Rebecca School teacher and social worker, who did not believe the recommendation was appropriate.  (IHO Op. at 18.)  Consequently, the IHO held that M.T. had been denied a meaningful opportunity to participate in the meeting.  (IHO Op. at 18.)

She also reasoned that the recommendation was undermined because a general education teacher was not present at the 2010 CSE meeting, which was required because the CSE had recommended that N.M. have access to a general education curriculum. (IHO Op. at 18.)  The IHO further concluded that the four-month time frame for the transitional paraprofessional was "arbitrary," and there was no evidence to determine whether that would be sufficient time and what supports would be needed after four months.  (IHO Op. at 19.)

The IHO also concluded that there was insufficient evidence presented to justify changing N.M.'s school year from twelve months to ten months, which the record suggested could cause a regression.  (IHO Op. at 19.)  Finally, the IHO held that the DOE had not established that the P.S. 20 class placement was

appropriate for N.M. because there was insufficient evidence as to how N.M would have been grouped appropriately in his class with students that had "similar educational, social and emotional, and management[] needs." (IHO Op. at 19.)

The IHO held that the Rebecca School was an appropriate placement for N.M and that equitable considerations supported the parent's request that the DOE pay the 2010-2011 tuition. (IHO Op. 19-20.)

The DOE appealed the decision of the IHO to the SRO who, in turn, reversed the IHO's decision.

The SRO first determined that the parent's due process complaint had not included claims that the CSE was invalidly composed due to the lack of a general education teacher or that the parent was denied meaningful opportunity to participate in the CSE. (SRO Op. at 9.)  The SRO consequently held that the IHO exceeded her jurisdiction in ruling on these claims because they had not been raised in the complaint, nor had the DOE "opened the door" to them during the hearing. (SRO Op. at 9.) However, the SRO found that the DOE had "opened the door" at the hearing to the issue of the transitional paraprofessional. (SRO Op. at 10.)

After detailing the evidence considered by the CSE regarding N.M.'s academic and behavioral capacities, the SRO concluded that the CSE "had sufficient information relative to

18

the student's present levels of academic achievement and functional performance at the time of the CSE meeting and developed an IEP that accurately reflected the student's special education needs." (SRO Op. at 13.) Accordingly, the SRO held that the IEP's recommendation of a 12:1:1 class with the four-month paraprofessional and related services was reasonably calculated to offer the student educational benefits for the 2010-11 school year. (SRO Op. at 13.)

With respect to the four-month paraprofessional, the SRO concluded that after the four-month time period, "the district would have determined if the student continued to require the services of a 1:1 transitional paraprofessional based on his needs." (SRO Op. at 14.) The SRO also noted that the record reflected that the CSE believed that the student needed the services of the paraprofessional "only as it pertained to the transition from the Rebecca School" to the proposed placement, but that the student otherwise did not require the services of a 1:1 paraprofessional. (SRO Op. at 14.) The SRO concluded that there was no support for the IHO's determination that the four-month paraprofessional would be "inappropriate to address the student's needs or that the district would have been unable or unwilling to modify his IEP had the student enrolled in the district's program and require[d] that the services of a 1:1

paraprofessional be extended beyond four months in order for the student to receive educational benefits." (SRO Op. at 14.)

The SRO also concluded that the hearing record did not indicate that N.M. required a twelve-month program as opposed to a ten-month program. (SRO Op. at 15-16.) Finally, the SRO held that there was no sign that the school district would deviate from the IEP in a material way if the student were to attend the proposed school. (SRO Op. at 17.) Because the SRO reversed the IHO's findings and concluded that the DOE had offered a FAPE, she did not reach the issues of whether the Rebecca School was an appropriate unilateral placement or whether the equities favored the parent for payment of tuition. (SRO Op. at 19.)

On June 24, 2013, the plaintiff filed a complaint in this Court. The Complaint challenges the decision of the SRO and alleges violations of the IDEA. (See Compl. ¶¶ 110-113.) The plaintiff moved for summary judgment on the IDEA claim and the defendant cross-moved for summary judgment on the same claim.

### III.

The plaintiff alleges that the DOE violated the IDEA and demands direct payment of N.M.'s tuition to the Rebecca School for the 2010-2011 school year. The plaintiff claims that the SRO's decision is not entitled to deference because of procedural defects and that the decision was substantively wrong in finding that a 12:1:1 classroom provided N.M. with a FAPE.

However, because of recent developments, there is a threshold question of whether the SRO erred by relying on a retrospective consideration of the DOE's ability to extend the provision of a transitional paraprofessional beyond the four months provided in the IEP.  See R.E., 694 F.3d at 186.

The Second Circuit Court of Appeals recently held that when a state officer or district court is deciding whether a recommended program provides a disabled child with a FAPE, the "IEP must be evaluated prospectively as of the time of its drafting and . . . retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered."  Id.  For example, in R.E., the Court of Appeals stated that if the IEP offers a child a 6:1:1 staffing ratio, the school district "may introduce evidence explaining how this structure operates and why it is appropriate," but it "may not introduce evidence that modifies this staffing ratio (such as testimony from a teacher that he would have provided extensive 1:1 instruction to the student)."  Id. at 187.

Here, the plaintiff points to the portion of the SRO's decision in which the SRO cited Ms. Ye's testimony and stated: "After the four month time period, the district would have determined if the student continued to require the services of a

1:1 transitional paraprofessional based on his needs." (SRO Op.
at 14, citing Tr. 42.)  The SRO later concluded:

> In consideration of the foregoing, I do not find support in
> the hearing record for the IHO's determination that the
> district's recommendation of a 1:1 transitional
> paraprofessional for a four month period was inappropriate
> to address the student's needs or that the district would
> have been unable or unwilling to modify his IEP had the
> student enrolled in the district's program and require that
> the services of a 1:1 paraprofessional be extended beyond
> four months in order for the student to receive educational
> benefits (see Reyes v. New York City Dep't of Educ., 2012
> WL 6136493, at *6 [S.D.N.Y. Dec. 11, 2012]).

(SRO Op. at 14.)

In Reyes ex rel. R.P. v. New York City Dep't of Educ., on
which the SRO relied, the District Court found that an SRO erred
in relying on testimony from the DOE psychologist that a 1:1
transitional paraprofessional, who was provided for three months
in the IEP, could be extended, if necessary.  No. 12 Cv. 2113,
2012 WL 6136493, at *6 (S.D.N.Y. Dec. 11, 2012).  However, the
District Court concluded that the unwarranted reliance on such a
retrospective change in the IEP did not render the remainder of
the SRO's analysis unpersuasive.  Id.  The District Court
affirmed that the SRO had correctly determined that the DOE had
provided a FAPE for the student.  Id. at *7.

In this case, the plaintiff argues that the SRO erred by
basing the SRO's decision on the possibility that the
transitional paraprofessional could be extended beyond four
months, if necessary.  After initial briefing in this case was

22

completed, the Court of Appeals for the Second Circuit issued
its decision in Reyes ex rel. R.P. v. New York City Dep't of
Educ., No. 13 Cv. 158, 2014 WL 3685943 (2d Cir. 2014), in which
the Court agreed with the District Court that the SRO's reliance
on testimony that the IEP could be modified to extend the 1:1
transitional paraprofessional beyond three months was improper
under R.E.  Id. at *6.  The Court of Appeals held that it was
"inappropriate . . . to take into account the possibility of
mid-year amendments in determining whether an IEP as originally
formulated was substantively adequate."  Id. at *7.  However,
unlike the District Court, the Court of Appeals determined that
there was insufficient evidence to support the SRO's findings
without a continuation of the 1:1 paraprofessional beyond the
three months provided in the IEP.  Id.  The Court consequently
assessed the IEP "as written," declining to take the possibility
of amendments into account, and ultimately deferred to the IHO's
decision that the IEP was inadequate.  Id. at *7-9.

       In this case, the SRO's decision regarding the extension of
the 1:1 transitional paraprofessional parallels the SRO's
improper finding in Reyes.  The SRO's decision in this case that
the district could have extended the 1:1 paraprofessional
support beyond four months if needed "in order for the student
to receive educational benefits" is similar to the improper
finding in Reyes, and indeed cited the District Court opinion in

<u>Reyes</u>.  (SRO Op. at 14.)  The Court of Appeals opinion in <u>Reyes</u> makes clear that any reliance on mid-year amendments of the IEP constitutes the type of retrospective adjustment of an IEP that is impermissible under <u>R.E.</u>  Therefore, the SRO here relied on improper evidence to support her decision that the DOE offered N.M. a FAPE.

In subsequent briefing, the parties have disputed how central this retrospective evidence was to the SRO's decision. The DOE urges the Court to discount this evidence and find that there is sufficient evidence to sustain the SRO's decision without considering the extension of the 1:1 paraprofessional. The plaintiff urges that there is insufficient evidence and argues that the Court should therefore credit the IHO decision which found that the IEP failed to provide a FAPE.  However, another recent Court of Appeals opinion indicates that the appropriate disposition in this case is to remand to the SRO for further proceedings.  <u>E.M. v. New York City Dep't of Educ.</u>, No. 11 Cv. 1427, 2014 WL 3377162 (2d Cir. July 11, 2014) (summary order) dealt with a case in which the plaintiff alleged that her daughter required constant 1:1 supervision, but the IEP only offered a 6:1:1 placement.  <u>Id.</u> at *16.  The SRO approved the IEP by relying in part on testimony by the teacher in the proposed classroom that the child would be provided with sufficient supervision in the classroom setting—"supervision

24

that would approximate 1:1 when needed." Id. The Court of
Appeals held that this constituted impermissible retrospective
testimony forbidden by R.E. Id. at *17. Rather than
subsequently reaching the merits of the case, the Court of
Appeals remanded to the district court due to the panel's "lack
of educational expertise," and stated that the district court
may decide the merits of the IEP claim, or "perhaps more
profitably," remand the case to the state administrative
officers for a reexamination in light of R.E.. Id. at *17-18.
The Court noted the merits of remanding a case to administrative
agencies where a court does not have sufficient guidance. Id.
at *18 (citing T.L. v. New York City Dep't of Educ., 938 F.
Supp. 2d 417, 436 (E.D.N.Y. 2013) (collecting cases)).

     In this case, before the Court of Appeals decision in
Reyes, the SRO based her decision as to whether the DOE offered
a FAPE in part on the possibility that the transitional
paraprofessional could be extended past the four-month period
that was provided in the IEP. (SRO Op. at 14.) It is now clear
that this was error. It is unclear, however, whether the SRO
would have found that the IEP provided a FAPE without the
possibility of extending the transitional paraprofessional.
This case should therefore be remanded to the SRO to determine
whether the DOE has provided a FAPE without resort to the
improper evidence. E.M., 2014 WL 3377162, at *18.

The plaintiff argues that because of this error and other alleged deficiencies in the SRO's decision and the IEP, this Court should proceed to the merits and defer to the IHO's decision.  Unlike in Reyes, however, there appears to be considerable record evidence in this case that N.M. can progress in a classroom without a 1:1 paraprofessional beyond a transitional four-month period.  (See SRO Op. at 14; Exs. 5, 9.) However, due to the SRO's clear reliance on improper evidence in finding a FAPE was offered, this Court does not have the "educational expertise" to excise the improper finding and still find that a FAPE was offered without further input from the SRO, particularly with regards to the question of the substantive adequacy of the IEP.  E.M., 2014 WL 3377162, at *17; M.H., 685 F.3d at 244 (stating that a court's review of administrative findings in the IDEA context must "be colored by an acute awareness of institutional competence and role").  On administrative remand, the SRO may find persuasive the DOE's argument that the retrospective testimony constituted a small part of the overall record and that a FAPE was offered even without it.  Or, it may conclude that the possibility of modification was a key support for its holding.  Rather than speculating, this Court will remand to the SRO for further consideration in light of the decision of the Court of Appeals in Reyes.

CONCLUSION

The Court has considered all of the arguments raised by the parties.  To the extent not specifically addressed, they are either moot or without merit.  For the reasons explained above, the defendant's motion for summary judgment on the IDEA claim is **denied**.  The plaintiffs' motion for summary judgment on the IDEA claim is **denied**.  This case is **remanded** for further proceedings to the state administrative officers in light of the decision by the Second Circuit Court of Appeals in <u>Reyes ex rel. R.P. v. New York City Dep't of Educ.</u>, 13-158, 2014 WL 3685943 (2d Cir. 2014).  **The Clerk is directed to enter judgment and to close this case.**

SO ORDERED.

Dated:  New York, New York
        September 22, 2014

_____/s/_____

John G. Koeltl
United States District Judge